Sure, junk the usual standard of review applicable to this case and fashion a new rule on discovery. After all, this professional witness does not wish to run the risk of being impeached for bias, so he wishes to protect his income tax returns from discovery. The majority extends him this *Page 790 
unique protection by the extreme of limiting discovery of his income tax returns, which just might show that he is more expert witness than practitioner of his profession. The result is that the proponent can still receive the benefit of the witness's testimony without running the risk of having his bias revealed. What a convenient and one-sided little arrangement. And all this time I have been laboring under the impression that all bias ismaterial! See generally C. Gamble, McElroy's Alabama Evidence § 149, et seq. (3d ed. 1977).
A clear statement and explanation of the standard of review in this type case was set forth by this Court in Ex parte DorseyTrailers, Inc., 397 So.2d 98, 102-03 (Ala. 1981), quoted recently in Ex parte Johnson, 485 So.2d 1098, 1106-07 (Ala. 1986):
 "The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief. The writ will not issue where the right in question is doubtful. Lassiter v. Werneth, 275 Ala. 555, 156 So.2d 647 (1963).
 "As the court stated in Campbell v. Regal Typewriter Co., Inc., 341 So.2d 120 (Ala. 1976):
 "`The Alabama Rules of Civil Procedure permit very broad discovery and the rules must be broadly and liberally construed. Cole v. Cole Tomato Sales, Inc., 293 Ala. 731, 310 So.2d 210 (1975). However, Rule 26 (c) recognizes that the right of discovery is not unlimited and gives the court broad power to control the use of the process and to prevent its abuse by any party. The rule does not allow an arbitrary limit on discovery, but instead vests the trial court with discretion in the discovery process. . . .
 "For this reason, mandamus will issue to compel discovery only in those cases where a clear abuse of discretion is shown. Ex parte Alabama Power Co., 280 Ala. 586, 196 So.2d 702 (1967).
". . .
 "It is the trial court's job to exercise its broad discretion in a manner that will implement this philosophy of full disclosure of relevant information and at the same time afford a party, or others, maximum protection against harmful side effects which would result from unnecessary disclosure. [Marshall v. Guerdon Industries, Inc.], 373 So.2d 322
(Ala. 1979).
 ". . . `Relevancy,' as used in our discovery rules, means relevant to the subject matter of the action and a reasonable possibility that the information sought will lead to other evidence that will be admissible. Drewes v. Bank of Wadley, 350 So.2d 402
(Ala. 1977); 8 Wright and Miller, Federal Practice and Procedure § 2008 (1970)." (Emphasis added.)
Petitioner does not dispute that it is entirely proper to impeach a witness on cross-examination by showing his or her bias or interest in the case. Indeed, bias is a material issue in anycase. In Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir. 1980), the Court of Appeals recognized the relevance of showing the extent to which an adverse witness has testified in past cases:
 "Impeachment of witnesses through a showing of bias or interest aids the jury in its difficult task of determining facts when it is faced with contradictory assertions by witnesses on both sides of the case. See, generally McCormick on Evidence § 33 (1972). A pecuniary interest in the outcome of a case may, of course, bias a witness. Id. A showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases." (Emphasis added.)
In Trower v. Jones, 121 Ill.2d 211, 117 Ill.Dec. 136,520 N.E.2d 297 (1988), the Supreme Court of Illinois held that the trial court did not abuse its discretion in permitting defense counsel to cross-examine plaintiffs' expert witness as to (1) his annual *Page 791 
income from service as an expert witness, and (2) the frequency with which his testimony is given in favor of plaintiffs rather than defendants in medical malpractice cases. In so holding, that court recognized and explained the relevancy of such impeachment evidence. Because of its excellent reasoning and analysis, I quote at length from that court's opinion:
 "Adding to the importance of effective cross-examination is the proliferation of expert `locator' services which, as a practical matter, can help the litigants of either side of most any case find an expert who will help advocate the desired position. As this case helps illustrate, many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field but also experts in the art of being a persuasive witness and in the art of handling cross-examination. As was stated in Kemeny v. Skorch (1959), 22 Ill. App.2d 160, 159 N.E.2d 489, little has the nonlitigating public (including the jury) realized `the true rhetorical masterpieces that come from the lips of medical experts.' 22 Ill.App.2d at 171, 159 N.E.2d 489.
 "The combined effect of both the greater latitude given expert witnesses during direct examination and the expertise of many expert witnesses as expert witnesses is aptly set forth by Professor Michael H. Graham as follows:
 "`In combating testimony of the expert witness, opposing counsel must rely upon his skill in probing at weaknesses in the basis and reasoning of the witness whether or not disclosed upon direct, without letting the witness reinforce his direct testimony in the process. He must do this with an expert witness more familiar with the subject matter. Of course, counsel also has available the use of learned treatises to assist him in fencing with the witness. Unfortunately, fencing with the witness is the impression the cross-examination of an expert witness often leaves with the jury, an impression trial counsel would prefer to avoid. The difficulty in conducting a successful destructive cross-examination is compounded by the growing number of experts whose livelihood is dependent in large part upon the litigation process. Such experts with their vast amount of litigation experience become exceptionally proficient in the art of expert witness advocacy.' Graham, Impeaching the Professional Expert Witness by Showing of Financial Interest, 53 Ind.L.J. 35, 40 (1977).
 "We have long recognized that the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest. (Sears v. Rutishauser (1984), 102 Ill.2d 402, 407, 80 Ill.Dec. 758, 466 N.E.2d 210; Chicago City Ry. Co. v. Handy, (1904), 208 Ill. 81, 69 N.E. 917.) The considerations discussed above further illuminate the ever-increasing importance of bringing to the jury's attention facts by which the jury may reasonably discount the credibility of an expert's testimony.
 "It is with this recognition of the important role of cross-examination that we view plaintiffs' arguments. We first focus on their arguments regarding inquiry into the expert's annual income from serving as an expert witness. Plaintiffs argue that evidence of an expert's financial interest in the case should be limited to the remuneration received for testifying (1) in a particular case, (2) for a particular party, or (3) for a particular party's attorney. They point to cases in which we have allowed such inquiries (see, e.g., Sears v. Rutishauser (1984), 102 Ill.2d 402, 80 Ill.Dec. 758, 466 N.E.2d 210; Chicago City Ry Co. v. Handy, (1904), 208 Ill. 81, 69 N.E. 917), and argue that such cases prescribe the limits of such a line of inquiry. They contend that an extension of these cases would bring before the jury information which is of only minimal probative value and which is confusing and highly inflammatory. Defendant responds that this case is analogous to Sears. He contends that no pertinent distinction can be drawn between allowing an expert to be cross-examined *Page 792 
regarding other employment by an attorney for a party (as was allowed in Sears) and allowing an expert to testify regarding other employment by the witness referral service through which he became involved in the instant case.
 "We believe that the questions regarding Dr. Martins' income which are at issue here were permissible, and we do not base our conclusion on the strict analogy to the facts in Sears suggested by defendant. Rather, we reach our decision based on an appreciation of the fact that the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a `track record' which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony. We find pertinent the following commentary from a recent annotation:
 "`That an expert in a particular field may be in effect a "professional witness" in lawsuits rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality.' (39 A.L.R.4th 742, 746 (1985).)
 "We thus find that it was proper to inquire how much Dr. Martins was earning annually from services relating to rendering expert testimony, and we find no impropriety in inquiring into such income for the two years immediately preceding trial."
(Emphasis added.) 520 N.E.2d at 299-300. The Illinois Supreme Court went on to hold, among other things, that the frequency with which an expert testifies for plaintiffs, as opposed to defendants, is relevant in determining the bias of that witness:
 "We also find that the circuit court properly permitted counsel to inquire, on cross-examination, as to the frequency with which Dr. Martins testifies for plaintiffs. Such information clearly has some relevance in determining whether an expert witness is biased or his opinion skewed. Attorneys, judges and many trial experts themselves are well aware that certain expert witnesses appear particularly willing to testify that medical negligence has occurred, while others appear particularly inclined to testify that there was no deviation from the appropriate standard of care. Obviously, the fact that a physician testifies only for one category does not necessarily mean that his testimony is not credible. For example, a physician may adopt a policy of testifying only on behalf of other physicians in order to avoid the resentment among his colleagues which could arise from testifying on behalf of individuals suing physicians. This would not mean that he testifies on behalf of doctors who he believes were actually negligent, but only that (for personal reasons) he prefers not to testify for plaintiffs regardless of the merits of their case. A reasonable jury can be expected to recognize the possibility that the expert witness has just such a legitimate concern, and the counsel presenting the witness may even wish to point out such a possibility to the jury. Nevertheless, information as to whether a particular expert routinely testifies for a particular category of party is certainly of some value in determining whether he may have a predisposition either to exculpate or find fault. There is no sufficient reason why this information cannot be weighed and evaluated by the jury along with all of the other evidence pertaining to the credibility of an expert witness."
(Emphasis added.) 520 N.E.2d at 301.
As respondents correctly point out, the issue in this case isnot the admissibility *Page 793 
of the plaintiff's expert's tax returns; rather, at issue is their discoverability. Because inquiry into the extent to which an expert has testified in past cases, and the compensation he or she has received for testifying, is proper cross-examination relevant to the issue of bias, it is within the trial court's discretion to rule that expert's tax returns to be discoverable. Chief District Judge O'Conner of the United States District Court for the District of Kansas reached the same conclusion in Baxterv. Navistar International Corp., [No. 85-2293, D.Kan., unpublished, May 18, 1987], a case directly on point and quoted in pertinent part below:
 "This is a products liability action in which the plaintiff has designated Mr. Sevart as its expert witness. Sevart is an engineer who admittedly has a prosperous business performing services as an expert witness. Defendant contends that Sevart testifies as an expert witness against manufacturers as a full-time occupation. As a consequence, defendant argues that Sevart has a financial interest in preserving his occupation and that defendant is entitled to the requested tax information for impeachment purposes. Defendant therefore contends that the tax returns in question are discoverable under Federal Rule of Civil Procedure 26 and that the magistrate's order compelling production thereof was proper.
 "It is well established that an order of the United States magistrate must stand unless it is clearly erroneous or contrary to law. 28 U.S.C. § 636
(b)(1)(A); DeVore Sons, Inc. v. Aurora Pacific Cattle Co., 560 F. Supp. 236, 239
(D.Kan. 1983); Rule 36 (IV)(1) of the Rules of Practice of the United States District Court for the District of Kansas. Applying this standard to the facts of this case, the court finds that the magistrate's order requiring Sevart to produce the tax returns must be affirmed.
 "There is no question that a party has the right to cross-examine an expert witness about fees earned in prior cases. See Collins v. Wayne Corporation, 621 F.2d 777, 783 (5th Cir. 1980). Defendant seeks to use the requested tax returns to cross-examine Sevart about the expert witness fees he has earned in previous cases. The Honorable Patrick J. Kelly has ruled in a similar case involving Mr. Sevart that the income tax returns of Mr. Sevart and Advance Technology, Inc., were discoverable. See Townley v. Vermeer Manufacturing Co., No. 81-1262 (D.Kan., unpublished, June 30, 1983). Although Judge Kelly's order dealt only with the returns of Mr. Sevart and his company, the court finds that it is also reasonable to compel production of Mrs. Sevart's returns, since she works for her husband and Advance Technology.
 "Plaintiff has failed to demonstrate that the magistrate's ruling requiring production of the requested tax returns is clearly erroneous or contrary to law. Plaintiff's objection to the magistrate's order of April 2, 1987, is therefore denied." (Emphasis added.)
The majority's focus on what it deems to be "the emerging qualified privilege disfavoring disclosure of one's income tax returns" fails to take into account the concomitant power of the trial court under Rule 26 (e), A.R.Civ.P., "to fashion an order with respect to the discovery sought that will `protect a party . . . from . . . undue burden . . .' by specifying `terms and conditions' under which the discovery sought may be had." Exparte Johnson, supra, 485 So.2d at 1110. Respondent aptly points out that petitioner did not seek a protective order limiting the scope or use of the requested discovery. Instead, petitioner sought protection "from having to respond in any way to said requested discovery." (Emphasis added.) However, if the trial court, in exercising its discretion, was of the same view as the majority, that "requir[ing] a non-party witness to produce all of his income tax returns for nine years preceding trial would be . . . prejudicial," the trial court could fashion an order limiting the discovery to a period of years that, in its view based on the testimony given in support of such an order, would not be overly burdensome or prejudicial. Similarly, *Page 794 
the trial court could limit the defendants' use of the information contained in the returns to only that which is relevant to the scope of the defendant's inquiry concerning the witness's bias. That information would include only the amount and/or percentage of the witness's annual income for the requested period that was derived from services as an expert witness, as well as to whom those services were rendered, assuming the latter is contained within the witness's tax returns.
Clearly, under the broad and liberal construction that our rules of discovery are to be given, when the "burden" of producing otherwise discoverable information can be lessened by fashioning a protective limiting order, that should be the remedy afforded — not a total prohibition on the discovery sought. Accordingly, I must dissent.